# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-25-00890-CV

---

**R. C. and P. K., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 340TH DISTRICT COURT OF TOM GREEN COUNTY
### NO. C240008CPS, THE HONORABLE ELIZABETH WATKINS, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Following a bench trial, appellants R.C. (Father) and P.K. (Mother) appeal from the trial court's order terminating their parental rights to Son, who was six at the time of trial, and Mother's parental rights to Daughter, who was three at the time of trial and has a different biological father whose parental rights have not been terminated.[1] Both Mother's and Father's parental rights were terminated under Texas Family Code subsections 161.001(b)(1)(D) and (E), and the order of termination concluded that termination of both parents' parental rights was in the best interests of the children. *See* Tex. Fam. Code § 161.001(b)(1), (D), (E), (2). We will affirm the order of termination.

---

[1] We refer to appellants as Mother and Father and to the children as Son and Daughter. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

## BACKGROUND

This case began in October 2023, when the Department received a report alleging that Mother appeared to be living in her car with two children, including Son, and had given Daughter, whose biological father was unknown at the time, to fictive kin. During the investigation, the Department learned that Mother had been staying in hotels before moving to church-based, sober-living housing. The church's pastor reported that Mother tested positive for methamphetamine, though the Department was unable to confirm that result. Mother maintained that she was positive only for marijuana because she had just moved back from Florida, where she had a medical marijuana card. Mother left the church housing to live with Father, who the pastor reported was "high." Mother was referred to Family Based Safety Services, including drug-testing services, an online drug-education course, and counseling services.

In December 2023, the Department received a report from the children's daycare that Mother was "acting erratic and they believed she was on drugs." Mother took a drug test, which came back positive for methamphetamine. Initially, Mother insisted that her positive result was from Adderall she took to stay awake. But in January, Mother admitted to a Department employee that she had used methamphetamine. She said that she was "having a difficult time staying sober because [Father] was providing [her] with illegal drugs" and she "can't say no when it's in front of her." Mother maintained that "we weren't doing it a lot, but we were doing it to have energy, not to be all messed up and not take care of our kids. It was just to have energy." Mother also disclosed to the Department that Father had been "physically aggressive towards her," including "taking swings," though his "punches are not landing," and throwing eggs at her.

Soon after, with the Department's assistance, Mother agreed to move to a different sober-living home with her children. The Department's safety plan required Mother's contact with

her children to be monitored and for Mother to submit to random drug tests. Mother "always tested negative," and the Department lifted its requirement of supervised visitation with the children. But by February, Mother was kicked out of the sober-living home for violating curfew, and she moved back in with Father and his brother, who was supervising Father's contact with the children per the Department's requirements in his safety plan. Elizabeth Huckabee, the Department's investigator during this time, testified that the Department had "concerns of domestic violence and concerns of substance abuse" with this living situation.

Later that month, the children's daycare expressed concerns about Mother's behavior, as it appeared she was "under the influence of something." The daycare also noted that Mother and Father had been picking up the children without Father's brother, which violated Father's safety plan. The Department's caseworker visited with Mother and noted that she was "very jittery, moving her arms and legs around excessively," and had "open sores" around her mouth. Mother refused to take a drug test—which was a requirement of her service plan—and denied knowledge of Father's drug use. The Department became concerned that the children were in an unsafe environment, so on February 23, 2024, the Department obtained emergency removal of the children from their home and sought termination of Mother's and Father's parental rights. Mother was arrested for driving while intoxicated the next day, and both parents tested positive for methamphetamine shortly after. Daughter, who was not yet two at the time, also tested positive for methamphetamine.

The Department administered new service plans for Mother and Father. Reagan Gamble, the Department's caseworker, testified that Father "somewhat" made progress with his services, as he completed his drug-and-alcohol assessment. However, Father declined to attend the recommended inpatient rehab treatment and testified that "they said there was nothing

3

wrong with me." Father was incarcerated in June for a parole violation, but after he was released in July, Gamble noted that Father was working and presenting regular paystubs, attending regular visits with the children, and giving the Department notice if he needed to miss a visit because of travel for his job. As part of her service plan, Mother completed outpatient drug rehab therapy, tested negative for illegal substances between April and September 2024, and attended classes on domestic violence. Mother did not attend NA or AA meetings after finishing her outpatient therapy program. But Gamble testified that overall, Mother was doing well and making progress:

> [Mother] had legal employment. She got HUD housing and had her own house that I was able to see that was appropriate. She was attending all of her visits with her children. The only time she missed a visit while I had the case, she let me know in advance that she had Court for her eviction. Other than that, she attended all of her visits. She was attending all of her OBGYN appointments,[2] and she was placed back on her mental health medication.

Because of Mother's progress and compliance with her service plan, the Department recommended a monitored return of the children to Mother, and the trial court ordered monitored return of the children to Mother on January 13, 2025.

During the monitored return, Mother was still expected to adhere to her service plan. Valerie Perez, the Department's caseworker from November 2024 on, testified that during the monitored return, Mother "was in somewhat compliance of her counseling," in that the Department asked her to complete "online or in-person for individual counseling," but Mother instead texted or called her former counselor from a women's shelter. Perez agreed that Mother "was in compliance with the drug testing and maintaining contact with me." But by March 26, 2025, the trial court held a hearing on the Department's motion to revoke the monitored

---

[2] Mother and Father have since had another child, referred to in this opinion as Baby. Mother's and Father's parental rights to Baby are not at issue in this appeal.

4

return based on its concerns for the children's safety. At that hearing, the trial court heard Mother's testimony about this period, including an altercation with Father that resulted in Mother and the children seeking safety at a family shelter.[3] Mother testified that

> I fell asleep in the school line waiting for [Son] because I go an hour early, and I was really tired from work. So I took a little nap while I was waiting on [Son] to get out of school. And my phone got on vibrate. So when I got to Walmart, I noticed my phone was on vibrate, and that's when [Father] was freaking out, thinking I was just out cheating on him. . . . [W]e usually share location, and my phone was going to die as well, and my location had turned off, so he thought I was being sneaky about something.

Father sent between 20 and 50 text messages saying "that he was going to beat me up. I don't know if he said he was going to kill me, but I know he said he was going to kill my dog." When asked if Father had been physically abusive before, Mother responded, "Yeah. . . . It hasn't been like, literally beating me to death, but he has hit me a few times."

In response to the threatening messages, Mother

> called the shelter . . . because I didn't want to go home and things escalate and my kids be taken. I just got them back. I love my kids. They're always going to be my first priority, and I'm going to do whatever it takes to save them. I don't want to lose them again.

Perez testified that Mother called her from Walmart, and she "picked [Mother] up and took her to the family shelter." Mother and the children stayed at the shelter for five days before returning home. Mother testified that about a week later, Father started coming back over to her house because "he said he was sorry." But Mother acknowledged that Father has said he is sorry "after every time he does this." She stated that "I don't think [Father] would ever do anything

---

[3] Mother's testimony from this hearing was admitted as an exhibit at the final bench trial.

5

to my kids, anyway." "He said he was going to beat me up. That was it." And she maintained that the children "didn't witness anything. My son was on his tablet, not paying attention, didn't even know what was going on, thought we were going to a motel."

At trial, Father repeatedly invoked the Fifth Amendment in response to questions about this incident and others regarding domestic violence, and he maintained that he never threatened to kill Mother's dog or hit her; he admitted that he had "detained her" instead. Father also agreed that he had discussed his "triggers and propensity for domestic violence with a counselor" while he was incarcerated during this case. And his understanding of why the children came into the Department's care was because "there was domestic violence." Before the texting incident, Father had attended some batterer-intervention-and-prevention program (BIPP) classes. Perez testified that the Department "re-referred him to BIPP again" after this incident, but "[h]e has not shown me any proof that he attended" or been able to demonstrate a change in his behavior from taking the courses. Since then, Father has had some visits with Son but missed others, including because he did not confirm a visit in advance.

Mother testified that she went to the shelter "to protect the kids" but thinks that decision was used against her "because after I went to the shelter, that's when all this stuff started coming up that me and [Father] couldn't be together." Mother reiterated that "going to the shelter was the worst mistake of my life, because now look where I'm at." Specifically, Mother referenced the Department's requirement that she stop seeing Father after this incident. After that, Mother testified that one night, "I was there alone with me and my kids," and "I didn't understand why the cops were knocking at my door at 10:30, 11:00 at night" so they hid in the bathroom. Son told Cayce Cowan, his counselor, about an incident in which "he and his family, including his father, [were] hiding in the bathroom from the police." After the Department learned that Father had been

6

reported to be back in Mother's home with the children, the trial court ended the monitored return on the Department's motion.[4]  The children were removed from Mother's home and returned to foster care.  Mother and Father maintain that Father was not in the home or hiding with the children in the bathroom.  Since the monitored return was disrupted, Mother testified that she told Son that

> the reason why he couldn't come home was because he went and told his counselor that his dad was hiding in the bathroom with us.  That's all I said.  And he said, "but he wasn't, Mom."  And I said, "I know, but that's what you said, so now we have to deal with this this way."

The Department made additional referrals for services after the disrupted monitored return, including for Mother's "individual counseling, some domestic violence classes, for her to also do visits and drug testing, as well as doing an [alcohol-and-drug] assessment."  But Mother testified that she started using methamphetamine as soon as the children were removed, "at least once a day to numb me from whatever I'm going through.  It's hard on me."  Perez testified that Mother tested positive for methamphetamine on June 18 and stopped drug testing after that.

Mother attended visits with the children during this period and maintained she was not using meth on days that she had visits, though Perez questioned whether Mother was being honest about her drug use on these days.  Perez also testified that Mother was not always "appropriate" with the children during visits.  For example, Perez described two visits in August where Mother and Son had a conflict, and Mother "did not calm down the situation or use any parenting skills."  On one occasion, Son wanted Mother's phone, which she had left in her car.  Perez testified that

---

[4]  Neither the Department's motion nor the court's order disrupting the monitored return is in the clerk's record, but testimony at trial establishes the factual and procedural background.

Instead of calming the situation using some parenting skills, she did arise the situation, where she was calling him names, calling him a loser, and telling [Son] that he's the reason why he's in care. . . . [I]t was disrupting other visits at the office. There was a supervisor that had to intervene and ask her to use some parenting skills and calm the situation. She did not do that.

Mother described the incident somewhat differently, stating that while Son was being difficult,

I was really just trying to ignore him and bouncing [Baby] on my knee. And he was the one calling me names, calling me a loser, saying I was stupid and that he didn't love me and all this stuff. And I was just, like, trying to ignore him, like bouncing [Baby] on my knee and playing with him. I had asked him to be quiet, and he wouldn't, and so that's when he got louder. I guess they thought it was me, but my voice carries. I'm a loud person. And so sometimes when I get on to [Son], people think I'm yelling at him, but I'm not. It's my voice. . . . I would never call my son a loser.

Mother admitted that she told Son "he was the reason that the children were in placement" and acknowledged that "it probably hurt his feelings." She also admitted that she requested that Son be removed from the visit so that she could continue her visit with her other children and that she blamed Son for ending the visit early. "I said it was his fault that he's acting like that, yes." Lisa Cook, the CASA case manager, testified that she "was present at that visitation, and I did hear her calling [Son] a loser, and that was concerning."

Shortly before trial began, Mother began an inpatient drug rehab that was scheduled for as few as thirty and up to ninety days. Mother testified that her plan was to stay for ninety days, then return home to do "whatever else that I have to do on my treatment plan" for Baby, including outpatient treatment, drug-and-alcohol assessments, and domestic violence counseling. Mother acknowledged that there is a no-contact order in place for Father, "so I will have no contact with him if that stays in place." But Mother testified that if it is lifted, she plans to do "couple's

8

counseling and work on our relationship because he is the father of my kids, and I do want him to be a part of their lives." During inpatient treatment, Mother has had virtual weekly visits with the children that Perez testified "have not been bad," though the "kids do get antsy." Perez acknowledged that Mother "is trying to get better."

Mother testified to her love for her children. "I love my kids, and they're important to me. I want to learn the right parenting skills, and I want to learn to take care of my son the right way." Mother agreed that she would benefit from more parenting classes, counseling, and learning how to regulate her own emotions. Mother testified that with Daughter, "We're really close; we love each other; we play. I do her nails; I do her hair, play dress up, you know, do girlie things." As to Son, she said:

> We have fun; we play together; we love each other; he's very attached to me. He's been through everything with me. So even though he's not my first, he's like my first. He was the first one I was actually a mother to. My [oldest child], you know, my grandma had her most of her life. Me and [Son], we're very close. We have a good connection. We have fun; we play; we laugh.

Cowan, Son's therapist, noted that Son loves his parents, "absolutely, without a doubt" and thinks he wants to stay with them, as "the last time I saw him, he expressed hope that maybe he could live with his dad." Cowan testified that when this case began, Son "was having out-of-control-type behaviors, not wanting to listen, being defiant with directives from adults, [and having] aggression at times towards others." She noted that Son was making progress between April 2024 and January 2025, when she saw "major improvements in behavior" and "mild improvements in the willingness to address trauma," as he "tended to be pretty reticent to discuss feelings on that." But after the monitored return began, Son began missing his therapy appointments. Cowan testified that Mother gave various reasons for why Son needed to miss

9

therapy, including Mother's preference for another time, Son's illness, and Mother's work conflicts. Mother eventually stopped responding to Cowan's rescheduling requests. When Son did go to therapy during the monitored return, Cowan noted that "particularly towards the end, there was a lot of aggression in sessions." Since the monitored return was disrupted, Cowan stated that Son still has "maybe a little aggression," but she has noticed "a very significant decrease in the acting out and aggression and much more emotional and behavioral regulation during sessions, the very next session after removal, even." For example, "even if he does something he's not supposed to do, I can generally say, '[Son], we're not supposed to do this,' and he moves forward." Perez echoed Cowan's testimony, noting that Son is "doing great" and "working really hard," and that she has seen a "night-and-day difference" with Son's progress since the monitored return disruption, and he has been consistent with counseling sessions.

Though Daughter is not in therapy, Perez testified to Daughter's development, noting that she is healthy, has met her milestones, and is up to date on her medical and dental appointments. While Daughter initially received speech therapy, she no longer needs it. Perez stated that Daughter "doesn't know a stranger. She will give hugs to everybody. She'll smile. She'll talk to everybody. She's just a sweet, innocent girl, and she just loves having fun with her brothers."

Perez testified that she believes termination is in the children's best interests "because the Department has [made] extensive efforts to reunify. We approved a monitored return, which was revoked . . . due to domestic violence." "Since it was revoked, we did weekly visits, mandatory drug testing. We provided services, parenting, [and] individual counseling. We also helped with transportation, and we provided in-patient and out-patient services." But "[Mother] and [Father] have repeatedly failed, not doing services and not providing a safe environment for

the kids. The children have been in [the] case nearly two years, and they deserve a home that they can have a safe environment and be protected." Likewise, Cook, the CASA case manager, testified that she has "no doubt at all" that the parents love their children, but "they just haven't shown good evidence through this trial that they realize the true understanding of why the monitored return was revoked. . . . I don't feel like they have done the work necessary to be able to get the children back." Cook therefore agreed with the Department's recommendation of termination.

The Department's plans for the children changed throughout the case, from reunification to relative adoption to non-relative adoption. Perez testified that Mother's mother "did not want to be [the children's] placement since she works an 8:00 to 8:00 job, and she doesn't have anybody to support her with the kids." And with Father's mother, "we're looking into some type of home study, but it's been very difficult to get any contact from her," noting that the Department has called, texted, left voicemails, and showed up at her house with no response. Perez also noted that throughout the case, Father's mother was not interested in being a placement. As of the second day of trial, the Department had identified a "potential adoptive home" for all the children (including Baby, who is not part of this case) with a couple in their mid-50s or early-60s who have adopted five children through the Department in the past, including two who still live at home along with two additional foster children.

While this case was pending, the Department identified Daughter's biological father as J.B., Mother's ex-boyfriend who lives in Jacksonville, Florida, where he works in construction. J.B. testified about how his family is "real excited," and he is "glad that I am the father of [Daughter], and I hope we get to bond and have a relationship." By the time the trial court entered its final order, J.B. had begun weekly virtual visits with Daughter. The Department

11

requested an expedited home study for J.B., who lives in a four-bedroom house and indicated his interest in being a placement for at least Daughter and possibly Son too.

Following a bench trial held on October 21 and November 4, 2025, the trial court terminated both Mother's and Father's parental rights. The trial court signed an order terminating Father's parental rights to Son, finding by clear and convincing evidence that Father had knowingly placed or knowingly allowed Son to remain in conditions or surroundings that endangered his physical or emotional well-being, that Father had engaged in conduct or knowingly placed Son with persons who engaged in conduct that endangered the child's physical or emotional well-being, and that termination of the parent-child relationship was in Son's best interest. *See* Tex. Fam. Code §§ 161.001(b)(1)(D), (E), (2). The order also terminated Mother's parental rights to Son and Daughter, finding by clear and convincing evidence that Mother had knowingly placed or knowingly allowed her children to remain in conditions or surroundings that endangered their physical or emotional well-being, that Mother had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being, and that termination of the parent-child relationship was in the children's best interests. *See id.* §§ 161.001(b)(1)(D), (E), (2). Mother and Father appeal.

**STANDARD OF REVIEW**

"To terminate parental rights, the factfinder must find by clear and convincing evidence that (1) at least one of the termination grounds set forth in Section 161.001(b)(1) or other sections of the Texas Family Code applies, and (2) termination is in the best interest of the child." *In re C.E.*, 687 S.W.3d 304, 308 (Tex. 2024). "Clear and convincing evidence 'will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to

12

be established.'" *Id.* (quoting Tex. Fam. Code § 101.007). This "higher standard of proof" is required "[b]ecause the termination of parental rights implicates fundamental interests." *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014).

An appellate court conducting a legal sufficiency review in a termination-of-parental-rights appeal considers all evidence in the light most favorable to the trial court's finding, as well as any undisputed contrary evidence, to determine whether a reasonable factfinder could have formed a firm belief or conviction that it was true. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). "Courts 'must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so,' but courts 'should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.'" *In re C.E.*, 687 S.W.3d at 308 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In a factual sufficiency review in a termination-of-parental-rights appeal, the appellate court considers and weighs disputed evidence contrary to the trial court's findings against the evidence in favor of the finding. *In re A.C.*, 560 S.W.3d at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* However, appellate courts "provide due deference to the decisions of the factfinder who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d at 503.

## FATHER'S APPEAL

On appeal, Father's court-appointed attorney has filed a brief concluding that his appeal is frivolous and without merit. *See Anders v. California*, 386 U.S. 738, 744 (1967); *Taylor*

13

*v. Texas Dep't of Protective & Regul. Servs.*, 160 S.W.3d 641, 646–47 (Tex. App.—Austin 2005, pet. denied) (applying *Anders* procedure in appeal from termination of parental rights). The brief meets the requirements of *Anders* by presenting a professional evaluation of the record demonstrating why there are no arguable grounds to be advanced on appeal. *See* 386 U.S. at 744; *Taylor*, 160 S.W.3d at 646–47. Father's attorney has certified to this Court that he provided a copy of the *Anders* brief to Father and informed him of his right to examine the appellate record and to file a pro se brief. To date, Father has not filed a pro se brief.

Upon receiving an *Anders* brief, we must conduct a full examination of the proceedings to determine whether the appeal is wholly frivolous. *Penson v. Ohio*, 488 U.S. 75, 80 (1988). We have reviewed the entire record, including the *Anders* brief submitted on Father's behalf, and have found nothing that would arguably support an appeal. We agree that Father's appeal is frivolous and without merit.[5]

## MOTHER'S APPEAL

Mother raises two issues on appeal, arguing that the Department (1) did not make reasonable efforts to return the children to her before seeking termination of her parental rights, *see* Tex. Fam. Code § 161.001(f), and (2) failed to prove that termination was in the children's best interests, *see id.* § 161.001(b)(2).

---

[5] We deny the pending motion to withdraw by Father's attorney. *See In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016) (per curiam). If Father, after consulting with counsel, desires to file a petition for review, his counsel should timely file with the Texas Supreme Court "a petition for review that satisfies the standards of an *Anders* brief." *See id.* at 27–28.

14

**Reasonable efforts to return**

First, Mother argues that the Department did not present evidence regarding any of the reasonable efforts it made to return the children to her before seeking termination of her parental rights. *See id.* § 161.001(f). In parental-rights-termination suits filed by the Department on or after September 1, 2023, Texas Family Code subsection 161.001(f) provides:

> (f) In a suit for termination of the parent-child relationship filed by the Department of Family and Protective Services, the court may not order termination of the parent-child relationship under Subsection (b)(1) unless the court finds by clear and convincing evidence and describes in writing with specificity in a separate section of the order that:
>
> > (1) the department made reasonable efforts to return the child to the parent before commencement of a trial on the merits and despite those reasonable efforts, a continuing danger remains in the home that prevents the return of the child to the parent; . . .

*Id.* § 161.001(f). Here, the trial court ordered the termination of the parent-child relationship under subsection (b)(1) and thus its order must comport with this subsection.

Mother contends that the Department failed to present evidence regarding the reasonable efforts it made to return the children to her as required by subsection (f). Mother's appellate brief acknowledges that this case involved "numerous referrals and the Department attempted to accommodate the parents." But she maintains that the Department "did everything to prevent this family from reunifying," specifically referencing the children's removal and no-contact order entered after the disruption to the monitored return due to Father's threats of domestic violence against Mother. Mother contends that the Department "stood firmly in the way" of her desire to reunify with Father and her "constitutional right to have her family intact," urging that the Department should have instead created a service plan that addressed Mother's and Father's "need for family counseling, including domestic violence counseling for both parents[.]" And

15

Mother maintains that the trial court could not have reasonably found a continuing danger under subsection (f) because the "only evidence" regarding Mother's home "was that it was appropriate."

When considering whether the Department proved by clear and convincing evidence that it made reasonable efforts to return the children to Mother, we look to relevant caselaw construing the Department's reunification efforts under subsection 161.001(b)(1)(N). *See D.F. v. Texas Dep't of Fam. & Protective Servs.*, ___ S.W.3d ___, ___ No. 03-25-00738-CV, 2026 WL 482451, at *8 (Tex. App.—Austin Feb. 20, 2026, no pet. h.); *In re M.N.M.*, 708 S.W.3d 321, 328–29 (Tex. App.—Eastland 2025, pet. denied) (citing *In re Facebook, Inc.*, 625 S.W.3d 80, 92 (Tex. 2021)). "Generally, implementation of a family service plan by [the Department] is considered a reasonable effort to return the child to the parent." *A.D. v. Texas Dep't of Fam. & Protective Servs.*, 673 S.W.3d 704, 714 (Tex. App.—Austin 2023, no pet.) (quoting *In re A.L.H.*, 468 S.W.3d 738, 744 (Tex. App.—Houston [14th Dist.] 2015, no pet.)). "Ultimately, 'the issue is whether the Department made reasonable efforts, not ideal efforts.'" *In re M.N.M.*, 708 S.W.3d at 329 (quoting *In re J.A.*, No. 04-20-00242-CV, 2020 WL 5027663, at *2 (Tex. App.—San Antonio Aug. 26, 2020, no pet.) (mem. op.)).

Here, the order of termination set forth the trial court's findings of the Department's reasonable efforts to return the children to their parents, including that the Department "created a family service plan"; "made a referral for services, provided services, or paid for services"; "initiated [a Family-Based Safety Services] case and put two different safety plans in place prior to removal"; "made numerous referrals to drug treatment and drug assessments, provided transportation, and helped with HUD housing"; "made home visits to assess child safety"; and "made texts and phone calls to re-engage [Mother] in her services." The record supports these findings. This constitutes sufficient evidence to support the trial court's finding that the

16

Department made reasonable efforts to return the children to Mother under subsection (f). *See, e.g.*, *D.F.*, 2026 WL 482451, at \*9 (concluding Department made reasonable efforts to return children to parent by developing service plan, requesting parent take drug tests, working with parent to schedule visits with children, assisting parent with finding housing, facilitating psychological evaluation and therapy sessions for parent, and placing children with family members); *C.G. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-18-00852-CV, 2019 WL 3367524, at \*7 (Tex. App.—Austin July 26, 2019, no pet.) (mem. op.) (concluding Department made reasonable efforts to return child to parent by developing service plan, attempting to communicate with parent, assisting parent with scheduling visits, and determining whether parent secured drug-free housing).

Further, Mother's argument regarding the "continuing danger" in the home focuses on the Department's evaluation of the current state of her home. But Mother has not challenged the predicate-ground findings as to subsections (D) and (E) on appeal. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *see also In re T.D.-B.*, No. 06-25-00054-CV, 2025 WL 3684457, at \*6 (Tex. App.—Texarkana Dec. 19, 2025, no pet. h.) (mem. op.) (overruling subsection (f) challenge when legally and factually sufficient evidence supports subsections (D) and (E) findings). Subsections (D) and (E) both require proof of endangerment. *In re S.B.*, 597 S.W.3d 571, 583 (Tex. App.—Amarillo 2020, pet. denied). And subsection (D) in particular focuses on "the child's surroundings and environment." *Id.* Inappropriate or illegal conduct by people who live in the child's home is a part of the "conditions or surroundings" of the child's home under subsection (D). *In re C.S.L.E.H.*, No. 02-10-00475-CV, 2011 WL 3795226, at \*4 (Tex. App.—Fort Worth Aug. 25, 2011, no pet.) (mem. op.) (citing *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.)). And "domestic violence 'may produce an environment that endangers the

17

physical or emotional well-being of a child' supporting termination under subsection (D)." *J.G. v. Texas Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 524 (Tex. App.—Austin 2019, no pet.) (quoting *In re P.W.*, 579 S.W.3d 713, 727 (Tex. App.—Houston [14th Dist.] 2019, no pet.)).

Here, there was evidence at trial of Mother's substance abuse and Father's domestic violence toward Mother that led her to seek protection for herself and the children at a family shelter. After Mother brought the children home from the shelter, she testified that Father was back at the home about a week later because he apologized, even though Mother acknowledged that Father has said he is sorry "after every time he does this." *See In re I.G.*, 383 S.W.3d 763, 770 (Tex. App.—Amarillo 2012, no pet.) ("[A] parent's failure to remove himself and his children from a violent relationship endangers the physical or emotional well-being of the children."). This constitutes sufficient evidence to support the trial court's finding that despite the Department's reasonable efforts to return the children to Mother, a continuing danger in the home prevented their return. *See* Tex. Fam. Code § 161.001(b)(1)(D), (f).

We overrule Mother's first issue.

**Best interest**

In her second issue, Mother contends that the Department did not establish that termination of her parental rights is in the children's best interests. There is "a strong but rebuttable presumption that the best interest of the child is served by keeping him or her with their natural parents." *J.G.*, 592 S.W.3d at 525 (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam)). When reviewing the trial court's best-interest findings, courts consider factors including (1) the child's wishes, (2) the child's emotional and physical needs now and in the future, (3) emotional or physical danger to the child now and in the future, (4) the parenting abilities of

the parties seeking custody, (5) programs available to help those parties, (6) plans for the child by the parties seeking custody, (7) the stability of the proposed placement, (8) the parent's conduct that may indicate that the existing parent-child relationship is improper, and (9) any excuses for the parent's conduct. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam. Code § 263.307 (stating that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and listing factors that court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment"). This list is not exhaustive, nor is one factor controlling. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Further, evidence on each factor is not required, and evidence presented to satisfy the predicate-ground finding may also be probative of the child's best interest. *See id.*

Mother points to the strong presumption that it is in the children's best interests to retain parental rights and argues that there was insufficient evidence presented at trial to overcome this presumption. She also cites to testimony regarding her progress in inpatient rehab, her plans to participate in outpatient rehab, the fact that she has secure housing that the Department has deemed to be "appropriate," her desire to improve her parenting skills, the bond she has with her children, and Son's stated desire to be with his parents.

However, in addition to the evidence at trial that Mother raises in favor of her argument on appeal, evidence also indicated that termination of her parental rights is in the children's best interests. For example, the evidence demonstrated Mother's and Father's significant history of drug use, particularly methamphetamine, as well as Daughter's positive drug test for methamphetamine immediately after removal in February 2024. Mother testified that as soon as the children were removed, she began using meth again.

19

The record also contains evidence of domestic violence between Mother and Father that affected the children. After Father sent threatening text messages to Mother, which made her fearful enough to seek protection for herself and the children in a family shelter, she began letting Father back into the home a week after she left the shelter because he apologized. Her testimony indicated that Father had engaged in similar behavior before, as she stated that Father has said he is sorry "after every time he does this." Mother minimized the impact that exposure to these threats had on the children, noting that the children "didn't witness anything." And Mother later testified that "going to the shelter was the worst mistake of my life" while acknowledging that she went to the shelter "to protect the kids."

Additionally, after the monitored return began, Mother stopped taking Son to regular counseling sessions, and Cowan noticed "a lot of aggression in sessions" when Son did attend therapy during the monitored return. After the monitored return was disrupted, Cowan stated that she noticed "a very significant decrease in the acting out and aggression and much more emotional and behavioral regulation during sessions, the very next session after removal, even." And testimony indicated that Mother's parenting was not always appropriate, including her admission that she told Son that "he was the reason that the children were in placement," which she acknowledged "probably hurt his feelings," and her escalation of a conflict with Son during a visit, during which Cook testified Mother called Son "a loser" and which led to Mother requesting that Son leave the visit early.

Testimony also established that the children, particularly Son, are doing well after removal. Though the Department's plan for the children has changed throughout the course of this case, the Department has identified a potential adoptive family with a history of multiple successful adoptions with the Department and who is willing to care for all the children. Further,

20

the Department is working with J.B. to identify whether he can be a placement for at least Daughter. "The need for permanence is the paramount consideration when determining a child's present and future physical and emotional needs." *M.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-17-00715-CV, 2018 WL 1023899, at *3 (Tex. App.—Austin Feb. 23, 2018, no pet.) (mem. op.) (citing *Robert T. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-12-00061-CV, 2013 WL 812116, at *12 (Tex. App.—Austin Mar. 1, 2013, no pet.) (mem. op.)). While a factfinder cannot terminate a parent's rights "merely because the child might be better off living elsewhere, 'a factfinder can consider that a child's best interest may be served by termination of parental rights so that adoption may occur rather than the impermanent foster-care arrangement that would result if termination were not ordered.'" *Id.* (quoting *Robert T.*, 2013 WL 812116, at *12).

Finally, "[a] factfinder may infer that past conduct endangering a child's well-being may recur in the future if the child is returned to the parent." *Id.* at *4. Here, the trial court could have concluded that Mother's drug use and selection of violent romantic partners "may recur in the future" if the children were returned to her and would expose the children to further emotional and physical danger. *See id.* The trial court could have similarly concluded that this conduct, as well as Mother's statements toward Son, reflected poorly on Mother's parenting abilities and suggested that the existing parent-child relationship was improper. *See id.*

Given the record in this case, we conclude that there is sufficient evidence from which the trial court could have formed a firm belief or conviction that termination of Mother's parental rights is in the children's best interests. *See, e.g., E.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00033-CV, 2020 WL 3968233, at *8 (Tex. App.—Austin July 7, 2020, no pet.) (mem. op.) (concluding sufficient evidence supported trial court's best-interest finding when,

among other things, parent consistently tested positive for drugs, including during monitored return, and stopped drug testing after monitored return was disrupted). This is particularly so because Mother does not challenge the endangerment findings. *See In re C.H.*, 89 S.W.3d at 27 ("The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child."). We overrule Mother's second issue on appeal.

## CONCLUSION

We affirm the order of termination.

_____

Rosa Lopez Theofanis, Justice

Before Chief Justice Byrne, Justices Theofanis and Crump

Affirmed

Filed: March 4, 2026

22